# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs January 10, 2006

## STATE OF TENNESSEE v. TORIAN DILLARD

**Direct Appeal from the Criminal Court for Shelby County**
**No. 03-01405   James C. Beasley, Jr., Judge**

**No. W2005-00152-CCA-R3-CD  - Filed April 19, 2006**

The defendant, Torian Dillard, was convicted by a Shelby County Criminal Court jury of attempted first degree murder, a Class A felony, and reckless endangerment with a deadly weapon and being a convicted felon in possession of a handgun, both Class E felonies. The trial court sentenced him to consecutive terms of forty years as a multiple offender for the attempted murder conviction and six years as a career offender for each of the Class E felony convictions, for an effective sentence of fifty-two years in the Department of Correction. On appeal, the defendant contends that the State excluded African-American venire members from his jury in violation of the Equal Protection Clause of the United States Constitution, the evidence was insufficient to sustain his attempted first degree murder conviction, and the trial court erred in ordering consecutive sentences. Having reviewed the record and found no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID G. HAYES and JOHN EVERETT WILLIAMS, JJ., joined.

Robert Wilson Jones, Shelby County Public Defender, and Tony N. Brayton, Assistant Public Defender (on appeal); Cornelius Bostick, Memphis, Tennessee (at trial), for the appellant, Torian Dillard.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; William L. Gibbons, District Attorney General; and Jerry Harris and Paul Hagerman, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTS

This case arises out of the defendant's February 10, 2003, shooting of his ex-girlfriend, Carla Taylor ("the victim"), as she and her one-year-old daughter, Precious, waited in her vehicle to pick

up her older children from Cherokee Elementary School in Memphis. The defendant pulled up behind the victim's vehicle, got out of his vehicle armed with a pistol, walked to the driver's door of the victim's vehicle, and fired directly at the victim through her driver's door window, causing the glass to shatter and fall on Precious and a bullet to graze the back of the victim's head. As a result, the Shelby County Grand Jury returned a four-count indictment charging the defendant with attempted first degree murder of the victim, reckless endangerment with a deadly weapon of Precious, being a convicted felon in possession of a handgun, and carrying a handgun on school grounds. However, the fourth count of the indictment, which charged the defendant with carrying a handgun on school grounds, was nolle prosequied prior to trial.

At the defendant's September 7-10, 2004, trial, the victim testified that she and the defendant had been in an on-and-off relationship for approximately five months until she ended their relationship about five days before the shooting and moved with her children to a new apartment. She said she did not let the defendant know her new address because he had threatened her. The victim testified that she was in the bathroom on the morning of February 10 when she heard a knock at the apartment door. Because she thought it was her cousin, who was the manager of the apartment complex, she sent her son to open the door. However, when she looked up, she was frightened to see the defendant standing behind her looking at her in the bathroom mirror. She said the defendant told her he loved her and would never hurt her, dropped a letter for her, and left the apartment.

The victim testified that, after the defendant's departure, she took her three older children to school and Precious to her mother's home and then went downtown to take care of a traffic ticket. While there, she also went to "the Citizen's Dispute" to get an order of protection against the defendant. However, she was unable to complete the paperwork due to the surgery she had undergone the previous week for a gunshot wound inflicted by the defendant. She then picked up Precious from her mother's and she and a friend ran errands together until her cousin, who had reported the early morning stalking incident to the police, informed her that a police officer was waiting at the apartment to talk to her about the incident.

The victim testified that immediately after talking to the police officer she drove with Precious to the elementary school to pick up her older children. As she was waiting for the children in the turn lane in front of the school, she looked up to see the defendant standing outside her vehicle pointing a gun directly at her. She next remembered "going down," "feeling a burning in [her] head," hitting the accelerator, and striking another vehicle. The victim testified that she ended up at the fire station down the street where she got out of her vehicle and discovered that a bullet had struck her in the back of the head and that glass from the driver's side window had landed on Precious, who was riding in the backseat of the vehicle.

The victim testified that the defendant made a number of harassing telephone calls to her mother during the two to three weeks that elapsed between her release from the hospital and his arrest. She said that during one of those calls her mother connected her to the defendant via the three-way calling feature on the telephone. When the call ended, she called Officer Birdsong, a Memphis police officer assigned to the case. The victim testified that as soon as she hung up the

phone she heard a knock at the door, looked out the window, and saw the defendant. She stated that she immediately called Officer Birdsong, but the defendant fled before officers reached her home. The victim identified several threatening letters she received from the defendant from jail, which were admitted for identification purposes only, and testified that they contained the defendant's pleas that she not testify against him and his threats to kill her and her family.

On cross-examination, the victim acknowledged the defendant moved to California during their relationship, that she asked him to come back and sent him bus fare for his trip, and that the shooting occurred approximately two weeks after his return. She further acknowledged that the defendant stated in some of his letters that he had only been trying to frighten her and had not intended to shoot her. She added, however, that in the same letters the defendant also stated either that he should have finished the job or was going to finish the job.

Jackie R. Wilson, Sr. testified that on the afternoon of February 10, 2003, he was stopped at an intersection in front of Cherokee Elementary School waiting for the light to change. He said that a young woman was stopped in the turn lane beside him and that a third vehicle pulled up behind him. Hearing a car door slam, he looked in his rear-view mirror and saw a young man in khaki pants and a dark, hooded sweater get out of the vehicle. As he watched, the young man pulled his hood down over his head, walked without hesitation to the driver's door of the young woman's vehicle, fired two shots at the young woman with a black pistol, ran back to his vehicle, and fled the scene. Wilson testified that the young woman, who was shot in the head, fell over and that he thought she was dead. He acknowledged on cross-examination that the photograph of the victim's vehicle showed only one bullet hole in the driver's side window but nonetheless maintained that he heard two shots fired.

Memphis Police Officer Robert Brown was the first officer to respond to the shooting. He testified that when he arrived at the fire station at 2:25 p.m., he found the crying victim repeatedly screaming, "He tried to kill me." He said that when he managed to get her partially calmed down she told him her ex-boyfriend, Torian Dillard, had shot her. Officer Brown testified that the victim had an open wound to the back of her head where a bullet had grazed her and that there was a gunshot entry to the driver's door window of her vehicle.

The victim's mother, Elsie Taylor, testified that the defendant called her a few days before the shooting wanting to know the victim's whereabouts. She said she did not tell him because he had previously threatened the victim and the victim was trying to hide from him. Taylor said the defendant told her he loved the victim and that if he could not have her no one would. She stated that after the shooting, the defendant called her again to tell her that he had only wanted to frighten the victim and had not been trying to kill her.

Sergeant Troy Berry of the Memphis Police Department testified that on February 13, 2003, he was assigned to the crime scene unit and called to collect a spent round that had fallen from the front passenger door panel of the vehicle involved in the shooting. On cross-examination, he

testified that from his observations of the vehicle, it appeared that only one shot had been fired through the driver's side window.

Officer Darrell Mobley of the Memphis Police Department testified that he responded to a stalking call at an apartment complex on Southern Avenue at approximately 1:00 p.m. on February 10, 2003. After first speaking with the apartment manager, he talked with the victim, who told him that the defendant had come to her apartment earlier that morning and threatened her. Officer Mobley testified that approximately five minutes after he had completed his report and left the apartment complex, the apartment manager called to tell him that the victim had been shot. On cross-examination, Officer Mobley testified the victim had told him that the defendant was threatening to kill her and that she was afraid of him.

Officer Debbie Birdsong of the Memphis Police Department testified that she was an investigator with the Metro Gang Unit and was assigned to locate the defendant. She said that at her suggestion the victim brought her into a three-way telephone conversation with the defendant by telling the defendant that Officer Birdsong was her cousin. She said that during the conversation the victim asked the defendant how he could say he loved her after trying to kill her. Officer Birdsong then asked the defendant how he could do what he did. She said the defendant responded, "[M]aybe I need to come back and finish the job." When Officer Birdsong asked why he would say something like that, the defendant replied, "[B]ecause it's God's will."

Officer Birdsong testified that on another occasion her phone rang and she recognized the victim's telephone number from her caller identification. When she picked up the phone, she heard the victim screaming at the defendant to leave her home and the defendant's voice in the background. She said she immediately called for officers to respond to the victim's home, but the defendant fled upon sight of the officers and they were unable to apprehend him. She testified that they eventually located and arrested the defendant on March 21 at a relative's home after the victim, who had continued to receive telephone calls from him, reported that he might be at that location. On cross-examination, Officer Birdsong testified that March 21 was the first time the defendant had called the victim without blocking his telephone number.

Lieutenant Jeff Clark of the Memphis Police Department testified that he participated in the search for the defendant, expending many man hours, but was never able to locate him.

Tennessee Bureau of Investigation Forensic Scientist Darrin Shockey, an expert in latent print examination, testified that he processed the five letters previously identified in the case. He said that he compared the fifty-one latent prints on the letters with the known prints of the defendant and a "Nathaniel Dale Tate" and found that all fifty-one prints were from the defendant.

Investigator Ronald Thomas Goodwin of the Memphis Police Department testified he was assigned to the District Attorney's Anti-Gang Team and prepared an investigative report on the letters involved in the case. He said that one of the letters was signed "Nathaniel Tate," but the other letters were signed with the defendant's name. Upon investigation, he learned that the defendant's

mailing rights had been suspended due to previous letters he had sent and that the defendant and Tate shared the same pod at the jail. He, therefore, surmised that Tate had mailed the letter signed with his name for the defendant.

Upon request, Investigator Goodwin read excerpts from the letters, as well as one letter in its entirety, aloud to the jury. After his testimony, the letter read aloud in its entirety was admitted as an exhibit and published to the jury, and selective excerpts read from other letters were admitted as a collective exhibit by stipulation of the parties. In the first excerpt, the defendant stated that he only wanted to scare the victim when he fired the gun. In the second excerpt, he accused the victim of cheating on him with other men, stated that he had seen her talking to the police, and said that he felt betrayed and crushed. The third excerpt stated:

> You may not know it, but you have death on you. Instead of trying to scare you, I should have killed you. You "crossed" the right one, though. You are walking dead while you live. Death is breathing down your back, tramp.
>
> You hurt me sooooo, so bad. I got to get you back for it.
>
> When I aim the assult raffle [sic] at you in the future, accept death like a big girl. Don't say shit. Don't flinch. You brought it on yourself. I'm sure you know I'm going to pull the trigger. This time, I'm going to shoot you in your head for real.

The fourth excerpt read aloud by Investigator Goodwin continued in a similar vein, stating: "You had to be nuts to choose me for an enemy. I still don[']t think you actually realize what you've gotten yourself into. I'm different from other people, Carla, especially when it comes to Revenge. I specialize in shedding the blood of those who cross me."

The letter read in its entirety, entitled "DEATH TO YOU," and written in a combination of black and red ink with various words and phrases underlined in red ink for emphasis, states in pertinent part:

> I'm ready to go to trial. I'm not concerned about the charges, whether or not I get found not guilty or guilty is of no interest to me at all. I'm just ready to fast-forward to the next episode of this "soap opera."
>
> I like action scenes. I want to see some action, some bloodshed!!!
>
> Jail time is a temporary solution for a permanent problem, at least for this situation it is. Revenge is the problem you will soon have to face, and my time in here is very temporary.
>
> You have a real, atrocious enemy now. I'm the worst enemy a person could ever have. I'm a ghost!!!

Once under surveillance, your every move will be known to me. The body-armor and artillery I will equip myself with will amaze a terrorist. My militaristic stratagem for a rapid onslaught is that of a Nazi soldier. When I strike, your lifeless body will be an absolute comeuppance.

I'm going to make a believer out of you. I'm sending you to hell–where you belong. It's your destiny.

The Bible says, "For the lips of a strange woman drop as an honeycomb, and her mouth is smoother than oil. But her end is bitter as wormwood, sharp as a two-edged sword. Her feet go down to death; her steps take hold on hell." (Proverbs: 5:3-5).

You "crossed" the wrong nigga [sic] this time, slut. You don't get away. I always get my enemy. Always. You'll see.

I never wanted revenge on anyone this bad before in my life. Never before has it been this intense. I hate you.

I'll sell my soul to the Devil just to see you dead. I'll spend the rest of my life in prison, happily, just to see you dead. My only purpose in life now is to see you dead!!!

How can I get over what you've done to me? You wrecked my whole life. Now I'm dedicated to taking yours. And, yes, I will kill every one of your kids if they're around you when I strike.

I want to dash gas on you and light it, and I would do just that if I could. I wish I could tie you up to a chair and drench you with gasoline. I would stab you in your stomach and leave the knife in you. Then I'll set you on fire!!!

The letter continues with specific threats to the victim's mother and brother and taunts to the victim to "watch how good the 'legal system' works" for the defendant. It then states: "Turn this letter in to the authorities. Look at all the stuff I said in it !!! Well, see you in TRIAL, tramp. Death to you, slut." The letter is signed "RIP."

At defense counsel's request, Investigator Goodwin read other excerpts from the letters aloud on cross-examination. In those excerpts, which were included in the collective exhibit, the defendant begged the victim not to prosecute him and stated that he had not intended to shoot her. A portion of the excerpt reads:

I know I made a horrible mistake, but the bullet grazing the back of your head was an accident. I've never caused you physical harm and you know I haven't. It was an

accident. Surely you know I wasn't trying to kill you. You know me better than that. I might say a lot of threatening things, but I've never tried to hurt you. I love you, Carla. I thought the loud bang and shattered window would scare you straight.

The State's final witness, Christina Lane, a criminal court clerk, testified that the defendant pled guilty to aggravated assault, a Class C felony, on April 25, 2000.

The defendant testified he had previously pled guilty to failure to appear, attempted rape, aggravated assault, felony escape, theft of property over $500, and robbery because he was guilty of those crimes. He had not, however, pled guilty in the instant case because he had only tried to frighten the victim, not kill her. He said his relationship with the victim began as a "sexually intense" experience, leading him to become "sexually addicted" to her. Within a short time, he became jealous of the telephone calls and visits the victim received from other men and the victim became verbally abusive to him and began to play games with his emotions. According to the defendant, the victim began a pattern of deliberately initiating arguments in order to break up with him for the weekend only to reconcile with him when the weekend was over. He said that on one of those weekends he found the victim at a local hotel and realized that she was cheating on him with another man. The defendant testified he believed the victim cheated on him with a number of different men. Nonetheless, he loved her and never physically harmed her. Instead, he attempted various other tactics to get her to behave, including trying to make her realize the potential health consequences of her promiscuity and encouraging her to accompany him to church.

The defendant testified that after one of their breakups he took a bus to California, where he ultimately spent two and a half weeks. He said he intended to leave the victim behind forever but quickly gave in to his emotions and telephoned her. She told him she loved him, promised to stop arguing, and wired him money for his return bus fare to Memphis. However, shortly after his return, she broke up with him again and moved to a new apartment without informing him of her address.

The defendant testified the victim ended their relationship sometime around February 5. He said the victim had previously talked about moving to an apartment complex on Southern Avenue, without mentioning the name, and on February 9 he learned where she had moved by driving up and down Southern until he spotted her vehicle. The next morning he knocked on her apartment door, was admitted by her son, and walked up behind the victim in the bathroom. He grabbed her by the shoulders, kissed her shoulder, and told her he loved her and had never hurt her. He then dropped a love letter for her on the floor and left the apartment. At about 11:30 a.m. he was asleep at his mother's house when the victim telephoned him and began verbally abusing him. He said he begged her to stop arguing and told her, "Don't make me fuck you off. Don't make me fuck you off." He also asked her if she was having sexual relations with another man and she replied, "Don't worry about who I'm fucking. I ain't fucking you."

The defendant testified that the victim's words "hit like a ton of bricks" and "triggered [his] rage." He said he drove to South Memphis, met some friends, and told them that he was "sick of this bitch playing . . . these games," that he had "a trick for her ass this time," and that he was "fixing

to scare the shit out of her." Next, he bought a gun from an acquaintance and headed toward Cherokee Elementary School, knowing that the victim would be there to pick up her children after school. When he arrived, he saw the victim stopped in her vehicle at a red light with a vehicle stopped in front of her. He pulled up behind her in his vehicle, blocking her escape, got out, pulled his hood down over his face so her children would not recognize him, walked up to her driver's door, and fired a shot behind her head.

The defendant insisted that he did not aim at the victim's head. He acknowledged his actions were wrong but was adamant that he had never intended to strike her with the bullet. He testified:

> I'm guilty for what I did. I did it. I did what I did. And I'm not trying to make an excuse for what I did. I'm not trying to say what I did was right. It was wrong. It was terribly wrong. But I did not try to kill her. It is no intent to kill. I couldn't -- I couldn't even hit her. There was not intent to kill [the victim]. I was not trying to kill her. This is the honest –

The defendant testified that he did not know his bullet had grazed the back of the victim's head until his cousin informed him of it later and that he felt terrible when he learned she had been hurt. He said his phone calls to the victim and her mother were intended to convey his love for the victim, his remorse, and his reassurances that he had not intended to hurt her. The defendant testified he went to the victim's home in order to give her some money to have her car repaired but fled when he realized he was being set up. He said he continued to love the victim and began to believe her when she told him in subsequent telephone conversations that she was not going to testify against him in court. Because he trusted her, he called her from his brother's home without blocking his phone number and, as a result, was captured by the police.

The defendant testified that he wrote the victim sixty or seventy letters from jail. He acknowledged that three of the letters were threatening and explained that he wrote them in anger after the victim called him at the jail, told him to hold on a minute, and then placed her phone in a position for him to hear her having sexual intercourse with another man. The defendant stated that he was angry and wrote the threatening letters to frighten the victim. On cross-examination, the defendant claimed that the prosecutor had coached all of the State's witnesses to fabricate their damaging testimony against him.

After deliberating, the jury found the defendant guilty of the charged offenses. At the November 12, 2004, sentencing hearing, the defendant's presentence report, which reflected his extensive prior criminal record, was admitted by stipulation of the parties. The sole witness at the hearing was the defendant, who accused the prosecutor of having knowingly used perjured testimony at his trial and testified that he had only wanted to scare the victim. At the conclusion of the hearing, the trial court sentenced the defendant to forty years as a multiple offender for the attempted first degree murder conviction, six years as a career offender for the reckless endangerment conviction, and six years as a career offender for the convicted felon in possession of a handgun conviction. Finding the defendant to be both an offender whose record of criminal activity is extensive and a

dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime when the risk to human life is high, see Tenn. Code Ann. § 40-35-115(b)(2), (4) (2003), the trial court ordered that the sentences be served consecutively, for an effective sentence of fifty-two years.

## ANALYSIS

### I. Jury Selection

As his first issue, the defendant contends that the trial court erred by allowing the State to exclude African-American venire members from the jury in violation of the Equal Protection Clause of the United States Constitution. Specifically, the defendant argues that the trial court erred by rejecting the defendant's Batson challenges to the State's exercise of peremptory challenges against Cassandra Graham, Odell West, James Holloway, and Samuel Moore, on the basis that the defendant failed to make out a prima facie case of discrimination in the jury selection process.

In Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), and cases that followed, the United States Supreme Court set out the procedure by which a trial court is to evaluate claims of racial or sexual discrimination in the jury selection process. To raise a Batson claim, the defendant must first make a prima facie showing of purposeful discrimination against a venire member. Batson, 476 U.S. at 93-94, 106 S. Ct. at 1721. This may be done by showing that the totality of relevant facts, considered together, raises an inference of purposeful discrimination:

> Defendant "may make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Batson, 476 U.S.] at 94, 106 S. Ct. at 1721. This showing may include proof of systematic exclusion, substantial underrepresentation on the venire, or the selection methods and results solely in the present case. Id. at 95, 106 S. Ct. at 1722. As to the purposeful requirement, defendant is entitled to rely on the nature of the peremptory challenge – that it permits "'those to discriminate who are of a mind to discriminate.'" Id. at 96, 106 S. Ct. at 1723 (quoting Avery v. Georgia, 345 U.S. 559, 562, 73 S. Ct. 891, 892, 97 L. Ed. 1244 (1953)). In the end, defendant must establish that a consideration of all relevant circumstances raises an inference of purposeful discrimination. Id. at 97, 106 S. Ct. at 1723.

Woodson v. Porter Brown Limestone Co., 916 S.W.2d 896, 902-03 (Tenn. 1996) (footnote omitted).

Once the defendant has established a prima facie case of discrimination, the burden of production then shifts to the State to offer a race-neutral explanation for the exercise of its peremptory challenge. Batson, 476 U.S. at 97, 106 S. Ct. at 1723; Purkett v. Elem, 514 U.S. 765, 767, 115 S. Ct. 1769, 1770, 131 L. Ed. 2d 834 (1995). This explanation "must be based on something more than stereotypical assumptions, but it need not rise to the level required to justify the exercise of a challenge for cause." State v. Ellison, 841 S.W.2d 824, 826 (Tenn. 1992) (citing

-9-

Batson, 476 U.S. at 97, 106 S. Ct. at 1723).  The race-neutral explanation need not be "persuasive, or even plausible."  Purkett, 514 U.S. at 768, 115 S. Ct. at 1771.  If there is no discriminatory intent inherent in the explanation, it will be deemed race-neutral.  Id. (citations omitted).

Finally, the trial court must consider the totality of the circumstances to determine if the race-neutral explanation offered by the State is actually a pretext for purposeful discrimination.  Batson, 476 U.S. at 97-98, 106 S. Ct. at 1723-24.  "Because the core issue is the prosecutor's discriminatory intent, or lack thereof, the trial court's finding 'largely will turn on evaluation of credibility.'"  Ellison, 841 S.W.2d at 827 (quoting Batson, 476 U.S. at 98 n.21, 106 S. Ct. at 1724 n.21).  The best evidence of discriminatory intent "'often will be the demeanor of the attorney who exercises the challenge.'"  Id. (quoting Hernandez v. New York, 500 U.S. 352, 365, 111 S. Ct. 1859, 1869, 114 L. Ed. 2d 395 (1991)).  "[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike."  Purkett, 514 U.S. at 768, 115 S. Ct. at 1771.

In its determination of whether a peremptory challenge has been exercised on discriminatory grounds, the trial court "'must carefully articulate specific reasons for each finding on the record, *i.e.* whether a prima facie case has been established; whether a neutral explanation has been given; and whether the totality of the circumstances support a finding of purposeful discrimination.'"  State v. Hugueley, 185 S.W.3d 356, 369 (Tenn. 2006) (quoting Woodson, 916 S.W.2d at 906).  "The trial court's findings are imperative for rarely will a trial record alone provide a legitimate basis from which to substitute an appellate court's opinion for that of the trial court."  State v. Carroll, 34 S.W.3d 317, 319 (Tenn. Crim. App. 2000).  The trial court's findings are entitled to great weight and will not be set aside on appeal unless found to be clearly erroneous.  Woodson, 916 S.W.2d at 906; Carroll, 34 S.W.3d at 319.

In the case at bar, the defendant raised his first Batson objection after the State had exercised peremptory challenges against Graham, West, and Holloway.  Defense counsel pointed out that all three were African-American and asserted that by striking them the State had excluded "the majority of the blacks that were on the jury."  The trial court rejected the claim without requiring the State to proffer a race-neutral reason for the challenges, finding that the defendant had failed to make out a prima facie case of discrimination.  The trial court's ruling states in pertinent part:

> [B]ased on my observations and the answers to the questions that were given, I don't think there is a Batson issue at this point.  So I'm not going to require the State to give reasons.  I'm not going to find that there's been a systematic exclusion.  And that's just based on my observations and the answers that I heard.  So at this point I will note your objection but I do not find that there is a systematic exclusion o[r] Batson violation based on what I've seen and heard so far.

The defendant again raised a Batson objection after the State challenged Moore.  Once again, however, the trial court ruled that he had not made out a prima facie case of discrimination:

I understand. But the only thing that I have seen the first three jurors that were challenged, in my opinion, based on my observation of the voir dire, based on the answer that they gave, I do not think that they were systematically excluded because of their race. Which I've already made that determination based on what I saw and what I heard.

The next juror that was excused was a female white. Then we have a male black. I don't, I don't believe that there is a systematic exclusion by the State with no basis. And at this point if I don't find that there's a systematic exclusion, I'm not going to require either side to give their reasons. I don't see that it has occurred, again, based on what the answers I heard and based on what I have seen in the courtroom. I just, I'm not prepared to reach that point. I understand the law and I'm watching it, but I don't see that I think the State is guilty of anything at this point, so I'm not going to require that they give any kind of explanation yet.

The defendant complains that the trial court did not sufficiently articulate its reasons, and we agree that it would have facilitated our review had the trial court provided more explicit and detailed findings of fact at the trial. The trial court did, however, provide more specificity at the hearing on the motion for a new trial, observing once again that the answers given by Graham, West, and Holloway during voir dire provided a valid basis for the State's exercise of peremptory challenges against them and that the trial court's own notes reflected that Moore "had some serious mental issues." The trial court further observed that the three jurors struck by the defense were all African-American females and that there "were many, many challenges left on the table" at the time the jury was impaneled.

At the hearing, the trial court expressed its confidence that the transcript would reflect the problematic answers given by the challenged venire members. Unfortunately, the venire members are, for the most part, referred to only as "Potential Jurors" in the trial transcript. Nonetheless, the transcript reveals that one potential juror told of negative experiences she and her children had had with the police and one or two others either expressed reservations or were silent when asked whether they would be able to convict the defendant should the State meet its burden of proving the elements of the offenses. The transcript further reveals that on several different occasions Moore failed to give any audible response to the prosecutor's direct questions. Thus, while it would have been helpful had the trial court stated for the record what specific answers the challenged jurors had given or approximately what percentage of the remaining venire members were African-American, and we urge it to do so in the future, we cannot conclude that it erred in finding that the defendant failed to make out a prima facie case of discrimination.

## II. Sufficiency of the Evidence

As his next issue, the defendant contends the evidence was insufficient to support his attempted first degree murder conviction. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, on appeal a

convicted defendant has the burden of demonstrating that the evidence is insufficient.  See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).  Thus, we must consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).  All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact.  See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).  "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).  Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation.  The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand.  Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses.  In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

The defendant was convicted of attempting to commit a first degree murder of the victim. Tennessee's criminal attempt statutes provides in pertinent part:

> (a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
>
> (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

(b) Conduct does not constitute a substantial step under subdivision (a)(3) unless the person's entire course of action is corroborative of the intent to commit the offense.

Tenn. Code Ann. § 39-12-101(a), (b) (2003). Tennessee Code Annotated section 39-13-202(a)(1) defines first degree murder in pertinent part as "[a] premeditated and intentional killing of another." Tennessee Code Annotated section 39-13-202(d) provides that

"premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d) (2003). Intentional "refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a) (2003).

The existence of premeditation is a question for the jury and may be inferred from the circumstances surrounding the killing. See State v. Gentry, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993). Among the circumstances supporting an inference of premeditation are a defendant's use of a deadly weapon on an unarmed victim, the particular cruelty of a killing, declarations by the defendant of an intent to kill, evidence that the defendant procured a weapon, preparations the defendant made before the killing for the concealment of the crime, and a defendant's calmness immediately after the killing. State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998) (citing State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Brown, 836 S.W.2d 530, 541-42 (Tenn. 1992); State v. West, 844 S.W.2d 144, 148 (Tenn. 1992)). A jury may also infer premeditation from the defendant's planning activities prior to the crime and his prior relationship with the victim, from which a motive may be inferred. Gentry, 881 S.W.2d at 4-5.

The defendant argues that the evidence presented at trial was insufficient to prove the element of premeditation beyond a reasonable doubt. We respectfully disagree. Among the evidence in support of the jury's finding of premeditation was the following: the defendant had a motive to kill the victim, in that he was intensely jealous at the thought of her with another man and enraged that she had ended their relationship; the defendant made threats to the victim that he would kill her and told the victim's mother that if he could not have her no one would; the defendant procured a weapon specifically for the shooting and went to the location at a time when he knew she would be present; the defendant took steps to conceal his identity by pulling his hood down over his face; the defendant walked directly and without hesitation to the driver's door of the victim's vehicle and fired his gun at close range at the victim's head; and the defendant fled the scene immediately after the shooting and spent the next several weeks hiding from the police. In addition, the defendant made

-13-

a number of statements after the shooting, both in telephone conversations and in his letters, to the effect that he should have finished the job or was going to finish the job. This evidence, taken together, was more than sufficient for a rational jury to find the defendant guilty of the attempted first degree murder of the victim beyond a reasonable doubt.

### III. Consecutive Sentencing

As his final issue, the defendant contends that the trial court erred in ordering consecutive sentencing. When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby 823 S.W.2d at 169. The burden, therefore, falls on the defendant to show that the consecutive sentencing imposed by the trial court is erroneous.

Tennessee Code Annotated section 40-35-115 provides that a trial court may in its discretion impose consecutive sentencing when it finds any one of a number of different factors by a preponderance of the evidence, including (2), that the defendant is an offender whose record of criminal activity is extensive, and (4), that the defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high. Tenn. Code Ann. § 40-35-115(b)(2), (4) (2003). When a trial court bases consecutive sentencing upon its classification of the defendant as a dangerous offender, it is required to make further findings that the aggregate length of the defendant's sentence reasonably relates to the severity of his offenses and is necessary to protect the public from further criminal conduct of the defendant. State v. Lane, 3 S.W.3d 456, 460-61 (Tenn. 1999); State v. Wilkerson, 905 S.W.2d 933, 937-38 (Tenn. 1995).

In classifying the defendant as an offender whose record of criminal activity is extensive, the trial court noted that, in addition to the convictions resulting from the instant case, the defendant had six prior felony convictions and ten misdemeanor convictions. The trial court also observed that the defendant, who was only thirty years old, had a criminal history that spanned the entire length of his adult life from the age of eighteen until the present. We conclude that the record fully supports consecutive sentencing on the basis of the defendant's history of criminal activity. As noted by the trial court, the defendant's presentence report reflects an extensive record of prior convictions, including felony convictions for attempted rape, aggravated assault, theft over $1000, felony escape, and failure to appear, as well as numerous misdemeanor convictions ranging from simple assault and harassment to evading arrest and reckless driving.

The record also fully supports consecutive sentencing on the basis that the defendant is a dangerous offender. In its comprehensive findings of fact, the trial court noted, among other things,

the defendant's stalking of the victim prior to the shooting, the fact that he chose a crowded elementary school as the locale for the shooting, the cold and calculated manner in which he executed the crime, and the "chilling" letters he sent while awaiting trial in the case. Based on all these circumstances, the trial court found that the defendant qualified as a dangerous offender whose behavior exhibits little or no regard for human life and no hesitation about committing a crime when the risk to human life is high. The trial court also made the necessary findings that the aggregate length of the sentences was reasonably related to the severity of the offenses and necessary to protect society from the defendant's further criminal conduct:

> But the facts and circumstances surrounding that including the stalking, the phone calls, the manner and method in which this crime was carried out, the location in which it was carried out in front of children, in front of a school, in the middle of traffic, the cold and calculated, premeditated way in which it was done, and then followed by this series of progressively more aggressive letters that were sent by the defendant to the victim while he's been incarcerated while this matter has been pending.

> The Court -- although those came after the fact and they're not part of the offense for which he was convicted, they, in my opinion, would go to Part B of that requirement that society and in particular the victim in this case, need to be protected from this defendant's unwillingness to lead a productive life.

> . . . .

> So it's very obvious that [the defendant] not only has the capacity and the capability of making these threats but even of getting those threats out over and above the orders of a Court and the penal system, and based upon those threats, based upon the serious nature of this offense, based upon [the defendant's] obvious anti-societal lifestyle and the fact that this attempted murder occurred under the circumstances in the location in front of children, in front of a school, in a crowd of automobiles in a carpool line, this Court feels that the aggregate length of the sentences reasonably relates to the offense for which this defendant stands convicted, and those sentences should be served consecutive[ly].

We, therefore, conclude that the trial court did not err in ordering consecutive sentences based on its classification of the defendant as a dangerous offender and as an offender with a record of extensive criminal activity.

## CONCLUSION

Having reviewed the record and found no error, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE